AO106 (Rev. 12/03) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

Sony Clie organizer, three memory sticks, and laptop computers

APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

Case Number: 1:05-M-135M

I, James McCormack being duly sworn depose and say:

I am a(n) Special Agent with DEA and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)
One Sony Clie personal entertainment organizer (serial #3013162), three memory sticks (one Sony 8MB #MSA-8A-D321Y3E, one Sony 32MB #MSA-32A-1323Y1A, and one memory stick still inserted in the aforementioned Sony Clie), and one Sony Laptop, (ID# AK8PCG4A1L), now in DEA custody.

in the District of RHODE ISLAND

there is now concealed a certain person or property, namely (describe the person or property to be seized)
electronic data pertaining to sales and prices of controlled substances; names and identifying and contact information of drug suppliers, customers, and accomplices; smuggling methods; collection, payment, and transmission of money, and financial data relating to profits, losses, debts, and concealment of the proceeds of illegal drug trafficking activities,

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence

concerning a violation of Titles 21 and 18 United States code, Section(s) 841(a)(i) and 856; 1956 and 1957

The facts to support a finding of probable cause are as follows:

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

James McCormack
Signature of Affiant

Sworn to before me and subscribed in my presence,

11-9-05 at Providence Rhode Island
Date City State

DAVID L. MARTIN, U.S. MAGISTRATE JUDGE
Name of Judge Title of Judge

David L. Martin
Signature of Judge

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

James McCormack, Special Agent of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, states:

1. I am a Special Agent with the DEA and have been so employed since 1997. I have received specialized training in investigation of drug dealing and money laundering, including the tracing of contacts amongst drug dealers and their suppliers, and the tracking of funds obtained from sales of controlled substances.

2. This affidavit is submitted in support of an application for a search warrant authorizing the search of one Sony Clie personal entertainment organizer (serial #3013162), three memory sticks (one Sony 8MB #MSA-8A-D321Y3E, one Sony 32MB #MSA-32A-1323Y1A, and one memory stick still inserted in the aforementioned Sony Clie), and one Sony Laptop, (ID# AK8PCG4A1L). These items were all taken from the person of Juan Giraldo at the time of his arrest on charges of sale of a kilogram of cocaine. The information in this affidavit is based on investigations conducted by myself and other Special Agents of the DEA, information provided by other law enforcement officers, and a reliable confidential source (CS) whose information resulted in the seizures of money and cocaine and the arrests and convictions described herein.

3. On March 14, 2004, I and other DEA agents and Providence police officers established surveillance around the vicinity of 25 Lubec Street Providence, Rhode Island. This was the residence of Clara Vasquez, the sister of Juan Giraldo. We were there to surveill a meeting between a confidential source (CS) and Giraldo and Vasquez for the purpose of having the CS buy a kilogram of cocaine from Giraldo. All three persons were observed entering and then leaving the apartment, after which the CS turned over to me a kilogram of cocaine he had just been provided by Giraldo.

4. The CS then engaged in phone conversations with both Giraldo and Vasquez about payment for the cocaine. He was given $24,500 in government funds to pay for the cocaine, and returned to the apartment, where he turned the money over to Vasquez. No arrests were made at that time because our investigation was continuing.

5. On April 4, 2004, the CS reported to me about a conversation he had heard between Giraldo and Vasquez. They had discussed travel plans for Vasquez and "Henry" (LNU) to take money to Colombia. The money would be in the form of U.S. currency concealed in money belts. One belt would hold $100,000; the other, $67,000. The source had also seen their travel itinerary, including airlines and flight numbers for travel from Providence through Miami to Colombia. I was able to verify all of the travel information. However, the CS had no information on whom the money would be delivered to, or who it was coming from other than Giraldo.

6. On the morning of April 5, 2004, the CS reported that Giraldo had put the money belt on Vasquez and that it contained cash which Giraldo had picked up from "Cristina" (LNU), at an unknown address. I and other agents established surveillance at the airport and observed Vasquez and another man, whose description matched "Henry," arrive and enter the airport together. However, they then immediately split up and thereafter acted like they did not know each other. This type of behavior is indicative of experience in transporting currency illegally. Experienced currency smugglers know that if one smuggler falls under suspicion from law enforcement and is stopped and questioned, his or her traveling companions are also likely to be questioned. Hence even if they are smuggling together they will act as if they are strangers.

7. Later that day, when "Henry" (subsequently identified as Henry Allen Muriel) and Vasquez attempted to change planes in Miami, they were stopped by DEA agents, were questioned, and gave consent for searches that revealed $105,880 in a money belt worn by Vasquez and $70,108 in a

money belt worn by Muriel. Both admitted that they had no plans to report the money as required by law. The currency was wrapped in plastic, which was subsequently submitted to the Warwick Police Department for fingerprint analysis. A latent fingerprint was developed on the plastic wrap which was positively identified as belonging to Juan Giraldo. The money was seized, but Vasquez and Muriel were not arrested.

8. About two months later, on June 7, 2004, the CS described a recent conversation with Giraldo which touched on the possibility of another sale of cocaine to the CS. Giraldo also told the CS that he was going to Colombia later that day, with his cousin Carlos. The CS stated that Giraldo's conversation indicated that he and his cousin would be carrying U.S. currency to Colombia.

9. Later on June 7, Juan and Carlos Giraldo and two other companions prepared to board planes at Logan Airport in Boston, Massachusetts for travel to Bogota, Colombia. They were approached by DEA agents and gave consents to search. All had U.S. Currency concealed on their persons. Juan Giraldo was found to be carrying $18,531; Carlos Giraldo $10,000; a third person $9,000, and a fourth $4,000. The fourth person admitted that the money he was carrying belonged to Giraldo. None of the four had declared the currency. All of them eventually consented to the money's forfeiture to the government.

10. Juan Giraldo was arrested at the airport. He was charged with the sale of the kilogram of cocaine he had previously sold to the CS. On his person were the organizer, memory sticks, and laptop computer described above. These items were seized and are now in the custody of the DEA in Rhode Island.

11. On February 18, 2005, Clara Vasquez was sentenced to 18 months incarceration as a result of a guilty plea to assisting in Giraldo's sale of cocaine to the CS on March 14, 2004. On July 29, 2005, Juan Giraldo was sentenced to incarceration for his sale of cocaine to the CS.

12. Despite these convictions, the DEA is continuing to investigate the organization with which Giraldo was affiliated. We are seeking to determine from whom he obtained his cocaine, how much he bought and sold, who his customers were, to whom he was sending the currency that was seized at Miami and Boston airports, and from whom he had obtained or received it.

13. The total currency connected to Giraldo for just these two incidents exceeded $200,000 in just two months, which is well in excess of his legal income. That fact and the indications of experience in smuggling described above lead me to conclude that Giraldo has been involved in organized and systematic drug trafficking and money laundering, and not just one or two episodes.

14. Additional evidence that Giraldo has a role in a significant criminal operation was provided by conversations he had with the CS, which were consensually recorded and which I have reviewed. On different occasions between March and June, 2004, Giraldo told the CS that "one of my guys got caught with 15 kilos;" that "I am big and I have very good connections;" and in a discussion about the seizure of currency from his sister and Muriel, he related that the other day he had sent someone else through Miami with money, and it got to Colombia without problems. In other, unrecorded conversations, he told the CS that he sent money to Colombia and to Mexico through other persons.

15. From my experience and based on my training, I have learned that drug traffickers and money launderers almost always keep records of their dealings. They need to keep track of their customers' names and contact numbers; quantities of drugs sold; quantities fronted and resulting moneys owed; prices (which often vary between customers); debts; shares of profits distributed to co-conspirators; and payments of money to suppliers and accomplices. Such records, if recovered by law enforcement, can provide valuable evidence about people involved in drug trafficking and money laundering, including their names, telephone and beeper numbers, suppliers and customers of drugs, and their roles in a drug trafficking organization.

16. Computer storage devices are often used by such violaters because they have memory capacities equivalent to thousands of printed pages. They also can be used in such a manner that the information is encrypted or coded to make it difficult to uncover by investigators. This would be important to a person such as Giraldo, who in many conversations with the CS has discussed his extreme concern about investigation by law enforcement.

17. The aforesaid information, considered in light of Giraldo's travel to Colombia with computers and memory devices on a trip in which he and accomplices were carrying concealed, undeclared currency, shows there is probable cause to believe that data contained within the devices holds information relevant to drug dealing, in violation of Title 21, United States Code, Sections 841 and 846, and money laundering, in violations of Title 18, United States Code, Sections 1956 and 1957.

18. I am therefor seeking authorization to have experts in forensic computer technology thoroughly search those devices, by methods designed to preserve the integrity of the data for use in subsequent investigations and potential criminal proceedings, for all forms of data stored therein which relate to sales and prices of controlled substances; names and identifying and contact information of drug suppliers, customers, and accomplices; smuggling methods; collection; payment and transmission of money, and financial data relating to profits, losses, debts and concealment of the proceeds of illegal drug trafficking activities.

By: James McCormack

James McCormack
Special Agent, DEA

Sworn to and subscribed
before me this 9th day of
Nov., 2005

David L. Martin

DAVID L. MARTIN

U.S. Magistrate Judge